**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| SYLVIA SINGLETARY, |
| Plaintiff, |
| v. |
| HOWARD UNIVERSITY, |
| Defendant. |

Case No. 1:17-cv-01198 (TNM)

**MEMORANDUM OPINION**

Sylvia Singletary alleges that Howard University terminated her employment in violation of the False Claims Act ("FCA") and in breach of her contract with the University. After she amended her initial complaint, the University moved to dismiss for failure to state a claim. The Court granted that motion, finding that Dr. Singletary neither sufficiently pleaded that she had engaged in protected activity as required by the FCA nor that she was in fact terminated by the University. *See Singletary v. Howard Univ.*, 314 F. Supp. 3d 330 (D.D.C. 2018) ("*Singletary I*"). Dr. Singletary now seeks leave to file a Second Amended Complaint. *See* Pl.'s Mem. in Supp. of Mot. for Leave to File, ECF No. 18 ("Pl.'s Mem."). Because she has failed to remedy the deficiencies of her prior complaint, and because her proposed claims would not survive a motion to dismiss if brought by the University, the Court will deny leave to file.

**I.**

Dr. Singletary is a licensed veterinarian employed by Howard University from early 2013 until August 2014. Second Am. Compl. 3, 10, ECF No. 18-1. During that time, she served as the University's Director of Veterinary Services. Second Am. Compl. Ex. 1 at 1, ECF No. 18-3.

She also served as a member of the University's Institutional Animal Care and Use Committee ("IACUC"). Second Am. Compl. 4.

As a recipient of government grants, the University must comply with various federal laws about the use of laboratory animals. *Id*. at 3. Dr. Singletary claims that during her tenure the "animals at Howard were being kept in conditions clearly in violation of" two such laws, the Animal Welfare Act and the Health Research Extension Act. *Id*. at 4. Mice were being housed "in areas that were too hot." *Id*. Starting in mid-2013, Dr. Singletary told her supervisor, Dr. Thomas Obisesan, of the rodents' living conditions "[o]n several occasions," each time "exhort[ing]" him to remedy the problem. *Id*. at 5. Dr. Obisesan was also on the University's IACUC, serving as Howard's designated "Institutional Official." *Id*. at 7.

When Dr. Obisesan "did not act on Dr. Singletary's concerns, she made the same complaints" to IACUC Chair Thomas Heinbockel and medical school Dean Mark Johnson. *Id*. at 5-6. The air temperature problem was "allowed to continue," and in April 2014, Dr. Singletary "found 21 laboratory animals dead of heat exhaustion." *Id*. at 6-7. Dr. Singletary then "decided that leaving the matter solely in Dr. Obisesan's hands would not be prudent." *Id*. at 7. She emailed the National Institutes of Health's Office of Laboratory Animal Welfare ("NIH"), a federal agency, to notify them of the rodents' death. *Id*.

Dr. Obisesan "was incensed by Dr. Singletary's submission" to NIH, which "finally spurred Howard to act and add air conditioning capacity that solved the problem." *Id*. At a team meeting a few weeks later, Dr. Obisesan "excoriated Dr. Singletary" and accused her "of a lack of professionalism and integrity" for contacting NIH. *Id*. at 7-8. Dr. Obisesan felt that she "had humiliated Howard before [NIH]." *Id*. at 8.

A little over a month later, Dr. Obisesan "sent Dr. Singletary a letter informing her that [her employment contract] was terminated." *Id*. The letter "gave her notice" that her last day of employment would be December 31, 2014. *Id*. Dr. Singletary continued working for the University until August 2014, when she resigned. *Id*. In a sworn declaration submitted to the Court, she explained that she resigned "because [she] found new employment," but that she also believed her resignation "was an involuntary termination forced upon [her] by Howard." Decl. of Sylvia Singletary 3, ECF No. 11-1. She "had no choice but to leave Howard" because "the attending veterinarian community is small[,] and she needed to protect her reputation" from "rumors within her professional community." Second Am. Compl. 10.

The proposed complaint alleges that (1) to receive and retain grant money, the University falsely certified to the government that it maintained appropriate living conditions for the laboratory animals; (2) Dr. Singletary tried to inform her supervisors that the University was not in compliance with federal law; (3) she contacted NIH directly when the University failed to take corrective action; (4) Dr. Obisesan fired her for contacting NIH; (5) "termination of [her] eighteen month initial appointment at Howard six months early constituted unlawful retaliation" in violation of the FCA; and (6) the University breached its employment contract with her by forcing her resignation. Second Am. Compl. 13-16. Dr. Singletary seeks various forms of relief, including back pay, lost benefits, contract damages, damages for emotional pain and suffering, and attorney's fees. *Id*. at 15-16.

## II.

A plaintiff can amend her complaint "once as a matter of course within 21 days" of service. Fed. R. Civ. P. 15(a)(1). In "all other cases," she may amend "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). The "grant or denial of an

opportunity to amend is within the discretion" of the Court. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Denial is warranted where the amended complaint shows a "repeated failure to cure deficiencies by amendments previously allowed." *Id*. Leave to amend may also be denied as futile "if the proposed claim would not survive a motion to dismiss." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996).

Litigants may move to dismiss a complaint when it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A valid complaint must contain factual allegations that, if true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Mere "labels and conclusions" or "naked assertion[s] devoid of further factual enhancement" are insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

In evaluating a motion to dismiss, the Court must construe the complaint in the light most favorable to the plaintiff and accept as true all reasonable factual inferences drawn from well-pleaded allegations. *In re United Mine Workers of Am. Emp. Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994). The Court need not, however, accept legal conclusions or mere conclusory statements as true. *Iqbal*, 556 U.S. at 678. Evaluating a motion to dismiss is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. It "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). The Court may judicially notice any fact that "is not subject to reasonable dispute

4

because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

## III.

Dr. Singletary's proposed amendments do not remedy the defects of her previous complaint, and her allegations would not withstand a motion to dismiss. Her FCA claim fails because she has not sufficiently pleaded that she engaged in protected activity giving the University notice that she was investigating fraud. And, because she resigned voluntarily, Dr. Singletary has failed to allege that the University breached any of its purported contractual obligations.

## A.

Anyone who "knowingly presents . . . a false or fraudulent claim for payment or approval" to the federal government is liable for civil penalties under the FCA. 31 U.S.C. § 3729(a)(1)(A). Individuals who help the government uncover false claims can receive a reward of up to 25% of the proceeds of a subsequent lawsuit or settlement. *Id*. § 3730(d)(1)(B). The FCA protects whistleblowers by allowing them to seek relief if an employer "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against" the employee because of "lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop [one] or more violations of this subchapter." *Id*. § 3730(h)(1).

To claim unlawful retaliation for investigating potential FCA violations, an employee must allege that she engaged in activity protected by the Act. *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998). She must also allege that her "employer had knowledge that the employee was engaged in protected activity," and that the "retaliation was motivated, at least in part," by that activity. *Id*.

Protected activity requires "investigating matters that reasonably could lead to a viable [FCA] case." *Id*. at 740. Unless an employer "is aware that the employee is investigating fraud," it cannot "possess the retaliatory intent necessary to establish a violation of [the FCA]." *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1260-61 (D.C. Cir. 2004). So when the employee's claimed protected activity falls within her regular responsibilities, she "must overcome the presumption that [she is] merely acting in accordance with [her] employment obligations" to show that the employer was put on notice. *Id*. at 1261.

Dr. Singletary's contends that "[t]his is not a case where in the course of filing a rote report, or executing her normal duties, the Plaintiff, in hindsight, now seeks to turn her job duties into a weapon under [the FCA] against her superiors." Pl.'s Mem. 3. Her pleadings belie this claim.

In dismissing her prior complaint, the Court noted that Dr. Singletary "fail[ed] to allege that either her internal reports to supervisors or her complaint to NIH were extraordinary to her regular responsibilities at the University." *Singletary I*, 314 F. Supp. 3d at 334. While she stated that she "informed her superiors" that the animals' living conditions needed improvement, Dr. Singletary also admitted that "her role at the University was to 'bring the institution into compliance'" with applicable federal regulations." *Id*. (quoting Pl.'s First Am. Compl. 3, 6). The Court found that her "sparse allegations—without further detail of who she informed or what she said—do not adequately show that her alleged actions were beyond the scope of her regular work responsibilities." *Id*.

The proposed amended complaint does not fix this. It notes that, as the Director of Veterinary Services, Dr. Singletary was "expected to spend 70% [of her] time and effort on Administrative Activities," which included "establish[ing] and direct[ing] an in-house quality

6

control program for monitoring animal health, care and nutrition." Second Am. Compl. Ex. 1 at 2. She was also tasked with creating "standard operating procedures to assure . . . [the] promotion of animal care, health and welfare" that govern "proper animal quarters and animal housing equipment maintenance." *Id*. Finally, her role required collaboration "with research investigators, physicians, veterinarians, dentists and students on all phases of the handling and care of experimental animals." *Id*.

Based on this job description, the reasonable factual inference one draws is that Dr. Singletary's "discussions with Dr. Obisesan" about the housing conditions of the laboratory animals fit squarely within her duty to monitor and promote animal care and welfare. Second Am. Compl. 5. So too did raising the "same complaints to Dr. Heinbockel and Dr. Mark Johnson." *Id*. Like her prior complaint, Dr. Singletary's amended claims do not suggest that her internal reports to supervisors "were extraordinary to her regular responsibilities at the University." *Singletary I*, 314 F. Supp. 3d at 334. *See* First Am. Compl. 3 (acknowledging that Dr. Singletary "was responsible for the care and custody of all laboratory animals utilized at Howard's College of Medicine" and that she helped "ensure proper care and the humane and ethical treatment of laboratory animals").

Dr. Singletary suggests that her external communication to NIH "was not within the ambit of [her] duties or job description." Second Am. Compl. at 7. Instead, notifying NIH was the "exclusive province" of Dr. Obisesan, the designated Institutional Official. *Id*. True, the Institutional Official is responsible for reporting on issues related to animal welfare. *Id*. at 4-5 (citing NIH guidance on IACUC procedures). But there's more. NIH's IACUC Guidebook notes that the "chief responsibility of the veterinarian [on the Committee] is to provide for the health and welfare of animals." Office of Laboratory Animal Welfare, *Institutional Animal Care*

*and Use Committee Guidebook* 54, https://grants.nih.gov/grants/olaw/guidebook.pdf.[1] And assuring animal welfare "necessitates a partnership among the Institutional Official, the IACUC, the veterinarian and the investigators." *Id*. at 19. Ultimately, proper animal care "may only be achieved when all of the players [including] the veterinary staff . . . contribute to a shared goal." *Id*.

Based on this description of the IACUC and her stated responsibilities, communicating with NIH and other university personnel to ensure animal welfare appear to be a normal part of the veterinarian's job. And Dr. Singletary was the veterinarian. She has thus failed to sufficiently allege that the mere act of emailing NIH constituted a protected activity. *Cf. Frett v. Howard Univ.*, 24 F. Supp. 3d 76, 87 (D.D.C. 2014) (holding that a plaintiff's report to an auditor about deficiencies and risks was within the terms of his employment).

Even if Dr. Singletary's communication to NIH was beyond her normal duties, she fails to allege that the University was aware she was investigating fraud. An "employee's investigation of nothing more than [her] employer's non-compliance with federal or state regulations" is insufficient. *Yesudian*, 153 F.3d at 740. To be covered by the FCA, her "investigation must concern "false or fraudulent" claims." *Id*. (quoting 31 U.S.C. § 3729(a)).

Simply stating that she "considered filing a qui tam action against Howard University," Dr. Singletary describes no other actions that would alert the University to an investigation about potentially fraudulent conduct. Second Am. Compl. 13. In fact, her email to NIH, [2] a copy of

---

[1] The Court takes judicial notice of the Guidebook as an official government publication that is "self-authenticating" under Federal Rule of Evidence 902(5). The Second Amended Complaint incorporates by reference similar guidance published by NIH. Second Am. Compl. 5 n.2.

[2] The Court also takes judicial notice of Dr. Singletary's email to NIH, which the University obtained through a request filed with the agency's Freedom of Information Office. *See* Def.'s Ex. 3 at 1, ECF No. 14-1. That Dr. Singletary sent the email and the accuracy of the email's contents cannot reasonably be

which her supervisor received when the government responded, bears the indicia of a routine report about noncompliance with the applicable laws. *See* Def.'s Ex. 3 at 11 (email from NIH on April 16, 2014 to Dr. Singletary, Dr. Obisesan, and others acknowledging Dr. Singletary's "prompt report" and including her original email).

Dr. Singletary's brief email told NIH that she "found 21 mice dead from heat exhaustion," noting that the room in which they were located "lost power over night." Def.'s Ex. 3 11, ECF No. 14-1. She added that "we have been having difficulty with receiving condition [sic] air in the facility." *Id*. Notably, she informed NIH that a "more detailed report" would follow "*after I have briefed the IACUC and the [Institutional Official]*." *Id*. (emphasis added). The email neither reveals nor implies a fraud investigation falling outside the scope of a veterinarian's responsibility to care for animals under her charge. Instead, Dr. Singletary seemingly acknowledges a duty to apprise Dr. Obisesan and the IACUC of the rodents' deaths, and to participate in preparing a later report.[3] Nothing in her proposed amended complaint undermines the Court's original description of this report as "a far cry from the grist of [an] FCA allegation." *Singletary I*, 314 F. Supp. 3d at 335 n.2.

In short, the Court cannot reasonably infer that Dr. Obisesan "possess[ed] the retaliatory

---

questioned for two reasons. First, Dr. Singletary incorporates the email she sent by reference and partially quotes it in her Second Amended Complaint. *See* Second Am. Compl. 7. Second, NIH's response to the email, obtained through the Freedom of Information Act, could be considered a "self-authenticating" official document that "require[s] no extrinsic evidence of authenticity in order to be admitted." Fed. R. Evid. 902; *see Williams v. Long*, 585 F. Supp. 2d 679, 690 (D. Md. 2008) (finding that government information obtained through a FOIA request was self-authenticating under Rule 902(5)).

[3] In a later email, NIH noted that "[t]he prompt consideration of this matter by Howard University was consistent with the philosophy of institutional self-regulation . . . . We appreciate being informed of this matter and find no cause for further action by this office at this time." Def.'s Ex. 3 at 3. The government's characterization of the matter buttresses the perception that Dr. Singletary's email was merely a routine incident report.

intent necessary to establish a violation of [the FCA]." *Martin-Baker Aircraft*, 389 F.3d at 1260-61. When an employee "engages in reporting activities that could be mistaken for routine actions in accordance with her employment obligations . . . courts have ruled as a matter of law that the employer could not have known that the employee's actions might lead to FCA charges." *Frett*, 24 F. Supp. 3d at 86-87 (cleaned up). Dr. Singletary's amended FCA claim is thus futile as it still would not survive a motion to dismiss.[4]

**B.**

Dr. Singletary's breach of contract claim fares no better. Her prior complaint failed to show that the Court had subject matter jurisdiction over the claim. *Singletary I*, 314 F. Supp. 3d at 335. A court lacks jurisdiction when the "irreducible constitutional minimum of standing" is not met. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, a plaintiff must allege a legally cognizable injury, among other requirements. *Id*. at 560-61.

Before the proposed amendments at issue here, Dr. Singletary provided no "factual detail[s] about who gave her the alleged termination notice, the format of the alleged communication, or any effective date of the termination." *Singletary I*, 314 F. Supp. 3d at 336. And the First Amended Complaint stated that her employment "would be terminated" and appeared to "impl[y] that the University, at most, evidenced the possibility of termination at a

---

[4] In dismissing Dr. Singletary's First Amended Complaint, the Court noted that the FCA "is self-evidently an anti-fraud statute," and that Federal Rule of Civil Procedure 9(b) requires plaintiffs to plead allegations of fraud with particularity. *Singletary I*, 314 F. Supp. 3d at 335. The Court found that Dr. Singletary's prior complaint failed to state with sufficient particularity the false claims that Howard made. *Id*. The University contends that Dr. Singletary "completely fails to address" this issue, asking: "When were these alleged certifications [about the laboratory animals' welfare] made? To whom? By whom?" Def.'s Resp. to Pl.'s Mot. for Leave to File 8, ECF No. 19. These questions appear to be unanswered by the proposed amended complaint. But as Dr. Singletary's FCA claim fails to sufficiently allege that she engaged in a protected activity or that Howard had notice of a fraud investigation, the Court need not decide on the sufficiency of the pleadings under Rule 9(b).

future date." *Id*. So the Court found that Dr. Singletary failed to plead an actual or threatened injury. *Id*.

The amendments help, but not enough. Dr. Singletary's new allegations establish subject matter jurisdiction. By adding details about her putative termination—she now claims that Dr. Obisesan sent her a termination letter in June 2014, that she resigned two months later, and that she believes she was forced to resign because of the circumstances of her employment—Dr. Singletary has adduced facts sufficiently suggestive of a legally cognizable harm. *See* Second Am. Compl. 11. Even so, leave to file these amendments will be denied, as they would not survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

To start, the University argues that Dr. Singletary failed to sufficiently allege that she had a contract with it. Def.'s Resp. to Pl.'s Mot. for Leave to File 10. The proposed complaint includes as an exhibit a "copy of the contract expressing the terms and conditions Dr. Singletary's employment with Howard." Second Am. Compl. 3. The exhibit characterizes its contents as an "offer" of employment in several locations. *See* Second Am. Compl. Ex. 1 at 1 (describing "this offer"); at 3 ("We request written confirmation of acceptance of this offer within 7 business days by signing in the space below."). It states that upon "receipt of this letter with your signature the Department will send the appropriate Personnel Recommendation through channels for the Provost and Chief Academic Officer approval. Only upon the approval of the Provost and Chief Academic Officer does this action become an official offer from the University." *Id*. at 3.

This copy of the letter was not signed by Dr. Singletary. *Id*. That said, Dr. Singletary alleges that a "fully executed version exists," but that "she is not in possession of it." Second

Am. Compl. 3. Construing the Complaint in the light most favorable to her, the Court assumes that the offer letter states the terms of a binding employment contract between the parties.

Dr. Singletary suggests that this contract was "evergreen" and that she was "entitled" to her job until "she chose to resign," the University "terminated the Contract for cause," or "the position was eliminated." Second Am. Compl. 3, 11. She claims that because the offer letter "states in part '[y]our initial appointment will be through June 30, 2015,'" this language "removes the contractual relationship from being at-will." Pl.'s Rep. in Supp. of Pl.'s Mot. for Leave to File 19, ECF No. 20. Thus, "Howard breached its Contract with Dr. Singletary by terminating her employment in June of 2014, with performance to stop effective December 31, 2014, without cause." Second Am. Compl. 11.

This is a step too far. In the District of Columbia, "absent express language indicating particular terms or duration of employment, the employment relationship is presumed to be at-will." *Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 21 61, 67 (D.D.C. 2005). This presumption applies "unless the parties state clearly their intention to limit the employer's right to terminate, such as by a contract provision setting out employment for a fixed term or language that allows termination only for cause." *Id*. at 68 (cleaned up). Rebutting the presumption requires "evidence of clear contractual intent on the part of both the employer and the employee" to create a for-cause contract. *Id*.

Dr. Singletary has alleged no such evidence of clear contractual intent. And she selectively quotes her offer letter. A review of its full text reveals no clear intent to create a for-cause employment contract. The quoted clause is in the first paragraph of the letter, and reads, "*If our recommendation is approved by the Provost and Chief Academic Officer*, your initial appointment will be through June 30, 2015." Second Am. Compl. Ex. 1 at 1 (emphasis added).

Beyond this conditional language, the letter contains no other section discussing termination. It therefore cannot be reasonably construed as showing a clear intent to eliminate the University's right to terminate Dr. Singletary's employment at will. Given the legal presumption against for-cause contracts, the expiration date is best understood as a ceiling, not a floor, on her initial appointment.

Threadbare allegations that the contract was "evergreen" do not overcome the presumption of at will employment either. *See Iqbal*, 556 U.S. at 678. The Court therefore concludes that, even drawing all reasonable inferences in favor of the Plaintiff, she has not sufficiently alleged that she enjoyed a for-cause employment contract.

But even if the University could not terminate her at will, Dr. Singletary's claim is still infirm. She was not fired in June 2014—she admits that "[h]er Howard employment terminated in August 2014." *Id*. at 10. In fact, she was not fired at all. She also admits that she "submitted a letter of resignation . . . because [she] found new employment, and [she] needed to protect [her] professional reputation and career." Decl. of Sylvia Singletary 3. Nonetheless, Dr. Singletary alleges that Dr. Obisesan terminated her contract for reasons that "were false, pretextual, and borne of [a] retaliatory animus." *Id*. at 8. She believes that Dr. Obisesan issued a termination letter "to make Dr. Singletary's terms and conditions of employment intolerable," and to pressure her to "resign and leave Howard as soon as possible." *Id*. at 10. She thus had "no choice but to leave Howard as soon as she could secure new employment." *Id*.

Because Dr. Singletary admits that she resigned and that her employment contract was terminable through voluntary resignation, her breach of contract claim fails unless she sufficiently pleaded that she was constructively discharged. She did not. A constructive discharge "occurs where the employer creates or tolerates discriminatory working conditions that

13

would drive a reasonable person to resign." *Taylor v. Fed. Deposit Ins. Corp.*, 132 F.3d 753, 766 (D.C. Cir. 1997). It does not occur "when an employee leaves an unpleasant but objectively tolerable job because alternatives have become more attractive, even if the employer's misbehavior creates the unpleasantness" motiving the employee's decision to leave. *Id.*

Dr. Singletary's amended claims include no facts showing that her employment conditions would have driven a reasonable person to resign. She suggests that Dr. Obisesan once "accused her of a lack of professionalism and integrity," and that he later sent her a termination letter. Second Am. Compl. 8. After this letter issued, Dr. Singletary continued to work at the University for two months, resigning when she found a new job. She offers no further details or allegations of mistreatment from which the Court can infer a discriminatory working environment. Dr. Singletary has failed to allege that the University breached any of its contractual duties when she resigned, and her claim would not survive a motion to dismiss.

**IV.**

For all these reasons, Dr. Singletary's Motion for Leave to File the Second Amended Complaint will be denied. A separate order will issue.

Dated: September 26, 2018                                      TREVOR N. MCFADDEN, U.S.D.J.